IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KAREN DAVIS, | ) | CASE NO. 5:12-CV-01982 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff  Karen Davis ("Plaintiff" or "Davis") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I.  Procedural History

On March 16, 2009, Davis filed her applications for DIB and SSI.  Tr. 76-79, 123-127, 133-136.  In her applications, Davis alleged a disability onset date of September 15, 2008.  Tr. 125, 133.  She has alleged disability based on fibromyalgia, arthritis, foot pain, back pain, gastrointestinal problems, breathing problems, depression and anxiety.  Tr. 46-48, 52-54, 64, 76-

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

79, 80, 84, 154, 175.  After initial denial by the state agency (Tr. 80-86), and denial upon reconsideration (Tr. 94-106), Davis requested a hearing (Tr. 107).  An administrative hearing was held before an Administrative Law Judge ("ALJ") on February 4, 2011.  Tr. 41-75.

In his February 15, 2011, decision (Tr. 8-27), ALJ James A. Hill determined that Davis had not been under a disability from September 15, 2008, through the date of the ALJ's decision.  Tr. 22.  Davis requested review of the ALJ's decision by the Appeals Council.  Tr. 6-7.  On June 21, 2012, the Appeals Council denied Davis's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal and Vocational Evidence

Plaintiff was born on April 29, 1976.  Tr. 49-50, 125, 133.  She is not married and has two children.  Tr. 50, 61.  At the time of the hearing, Plaintiff was 34 years old.  Tr. 50.  She completed tenth grade.  Tr. 51.  She can read and write in English.  Tr. 51.  She has worked as a nurse's aide.  Tr. 69, 155.

### B.    Medical Evidence

Plaintiff's medical records and reports show complaints relating to a variety of physical conditions, including  spine dysfunction, cervical segmental dysfunction, myofascial pain syndrome, fibromyalgia, plantar fasciitis, irritable bowel syndrome, and abdominal pain.  Tr. 223, 243, 250, 254, 257, 355-56, 367-71, 373, 375-76, 412-13.

#### 1.    Treatment records

##### a.  Pain management related issues

On November 8, 2007, Davis began treating with Mark J. Pellegrino, M.D., a physiatrist, for complaints of persistent right neck and shoulder pain and right arm pain and numbness.  Tr.

375-76.  He diagnosed Davis with right cervical segmental dysfunction, associated myofascial

pain syndrome/regional fibromyalgia, and myospasms.  Tr. 376.  He recommended that she

continue with Percocet but discussed with Davis the goal of weaning her off of the Percocet and

finding other means of providing pain relief and functional improvement.  Tr. 376.  He ordered

physical therapy and also recommended that she come back in a week to try diagnostic and

therapeutic trigger point injections.  Tr. 376.  Davis continued to see Dr. Pellegrino throughout

the remainder of 2007 and 2008.  Tr. 218-19, 364, 367-69, 370, 373-74.

During a January 14, 2008, visit with Dr. Pellegrino, Davis reported that her pain was

interfering with her ability to work.  Tr. 370.  During a February 13, 2008, visit with Dr.

Pellegrino, Davis denied any neurological symptoms or bowel and bladder problems.  Tr. 369.

Following foot surgery in March 2008, on April 28, 2008, Dr. Pellegrino reported that Davis was

walking a lot better and had decreased pain in her left foot.  Tr. 367.  During that same April 28,

2008, visit, Davis reported that Ultracet and Percocet were working well, she was not

experiencing any side effects and she was not misusing the medication.  Tr. 367.

On May 25, 2008, Davis presented to the emergency room with complaints of abdominal

pain.  Tr. 242-44.  The emergency room physician opined that Davis's symptoms were the result

of gastritis versus peptic ulcer disease.  Tr. 242.

On August 25, 2008, Davis saw Dr. Pellegrino for a follow-up examination.  Tr. 364.

Davis reported that, with pain medication, her pain level was averaging a six out of ten.  Tr. 364.

Dr. Pellegrino's physical examination revealed particular pain in the right more than left cervical

trapezial areas with localized spasms.  Tr. 364.  His examination also revealed pain in the

lumbrosacral areas bilaterally.  Tr. 364.  Davis's range of motion was within normal limits

without joint swelling, effusion or heat.  Tr. 364.  Dr. Pellegrino continued Davis's Percocet and Ultracet.  Tr. 364.

On September 18, 2008, Davis was admitted to the emergency room with complaints of changes in her mental status and an inability to recognize her family and fiancé.  Tr. 261-64, 316-34.  She was discharged on September 21, 2008, with a principal diagnosis of Tylenol overdose and secondary diagnoses of fibromyalgia, Burkitt's lymphoma, and acute renal failure. Tr. 261.  Plaintiff was taking two pain medications both of which contained acetaminophen and she admitted to also taking Extra Strength Tylenol for about a week.  Tr. 263.  Davis's renal function quickly improved.  Tr. 263.  On discharge, Davis was stable and doing well.  Tr. 263. The ER doctors advised Davis to discontinue her prescription pain medications until she spoke with her physicians at the pain clinic.  Tr. 263.

On October 24, 2008, Davis followed up with Dr. Pellegrino.  Tr. 363.  Although advised to stop taking her Percocet and Ultracet, she reported that she was still taking those medications. Tr. 363.  Dr. Pellegrino advised her again to stop taking Tylenol based medications until she showed improvement with her liver and renal function.  Tr. 363.  He suggested aspirin based products such as Oxycodone or Tramadol without Tylenol.  Tr. 363.

On January 14, 2009, upon referral from her primary care physician Dr. Riggs, Davis switched pain management treatment from Dr. Pellegrino to Jamesetta Lewis, D.O., a physician with Affinity Medical Center.  Tr. 539-43.  Davis informed Dr. Lewis that she had discontinued physical therapy sessions because she felt it was not helping.  Tr. 540.  She indicated that the only thing that helped her pain was rest and a hot bath.  Tr. 540.  Her pain was worse in cold weather and when she stood for prolonged periods of time.  Tr. 540.  She complained of weakness all over her body and numbness in her hands, neck and shoulders.  Tr. 540.  She denied

loss of bowel or bladder control.  Tr. 540.  On examination, Dr. Lewis observed that Davis arose

from a sitting position without difficulty.  Tr. 540.  Davis did not have an antalgic gait.  Tr. 540.

Dr. Lewis observed signs of symptom magnification.  Tr. 540.  Davis had over-reaction and

exaggerated painful response to stimulus and was crying throughout the physical examination.

Tr. 540-41.  Dr. Lewis observed positive myofascial pain throughout the cervical, thoracic and

lumbar regions.  Tr. 541.  Dr. Lewis concluded that Davis was not an appropriate candidate for

narcotic medications and noted that, when Davis heard that she would not be receiving a

prescription for Percocet, she became very upset.  Tr. 541.  Dr. Lewis explained that there were a

variety of other treatments for fibromyalgia, including certain antidepressants, other non-narcotic

medications, and increasing her physical activity.  Tr. 541.  Dr. Lewis prescribed different

medications, noted that she may benefit from Botox injections in the cervical and bilateral

shoulder regions, and referred her to a psychiatrist for further evaluation in regard to increasing

depression and chronic insomnia and possible history of hypochondriasis.  Tr. 541.

Plaintiff saw Dr. Lewis again on February 19, 2009 (Tr. 537-38), April 23, 2009 (Tr.

534-35), and May 28, 2009 (Tr. 533).  During her April 23, 2009, visit, Dr. Lewis noted that

Davis stopped her new medications at the first sign of a side effect without allowing for an

adequate trial period.  Tr. 534.  Although Dr. Lewis recommended exercise as an effective way

to manage pain associated with fibromyalgia, Davis indicated that she was in too much pain to

exercise.  Tr. 534-35.  Dr. Lewis noted that, if Davis continued to disregard the treatment

recommendation, she would be discharged from the office.  Tr. 536.  Dr. Lewis encouraged

Davis to go to Phoenix Rising Behavioral Health ("Phoenix Rising") for evaluation and possible

treatment for chronic depression, fibromyalgia, and a possible diagnosis of hypochrondriasis.  Tr.

535.

During her May 28, 2009, visit, Dr. Lewis noted that Davis had been seen by the Cleveland Clinic Rheumatology Department.  Tr. 533, 421-32.  Elizabeth A. File, M.D., with that rheumatology department had advised Davis that she did not see any rheumatologic disorders.  Tr. 431.  Dr. File advised Davis that she might be mildly deficient in vitamin D and potassium and suggested that she consider taking vitamin supplements and eating bananas a couple days each week.  Tr. 431.  Also, during the May 29, 2009, visit, Dr. Lewis again noted that Davis exhibited signs of symptom magnification.  Tr. 533.  Davis reported that she was taking her Skelaxin and it was providing pain relief.  Tr. 533.  She also indicated that she was attempting to increase her exercise.  Tr. 533.

On August 28, 2009, Davis saw her primary care physician, Karen T. Riggs, M.D., to discuss her pain management treatment.  Tr. 490.  Davis reported that Dr. Lewis would not prescribe the narcotic medication that Davis felt worked best to relieve her pain and that Dr. Pellegrino had been prescribing.  Tr. 490.  Dr. Riggs suggested that Davis contact Dr. Pellegrino to determine whether she could resume pain management treatment with him.  Tr. 490.  On December 3, 2009, Davis again saw Dr. Riggs and requested a higher dosage of Darvocet.  Tr. 489.  Davis indicated that the only time she obtained any pain relief was when she was taking Darvocet.  Tr. 489.  Dr. Riggs agreed to write a prescription for Darvocet.  Tr. 489.  However, she explained again that she was not a pain management physician and Davis would need to speak with Dr. Pellegrino about resuming treatment with him.  Tr. 489.

On January 4, 2010, Davis did return to Dr. Pellegrino.  Tr. 494-95.  Davis reported an average pain level of an 8 or 9 out of 10.  Tr. 494.  She had tried physical therapy and massotherapy but still hurt all over.  Tr. 494.  She reported that Darvocet helped control her pain and allowed her to be more functional.  Tr. 494.  She denied any side effects from the Darvocet

and denied constipation or incontinence.  Tr. 494.  Her weight had been stable.  Tr. 494.  On physical examination, her gait and balance were normal and cervical and extremity motions were normal without joint swelling, effusion or heat.  Tr. 494.  Palpation revealed widespread pain, including all 18 designated tender points.  Tr. 494.  Dr. Pellegrino agreed to take over her pain medication.  Tr. 494.  Davis was continuing to take Tylenol and Dr. Pellegrino advised her to stop.  Tr. 494.  Dr. Pellegrino administered trigger point injections.  Tr. 495.

A month later, on February 3, 2010, Davis saw Dr. Riggs again and reported feeling a little better since having seen Dr. Pellegrino.  Tr. 488.  Dr. Riggs discussed the importance of stress reducing activities and alternative therapies for Davis's pain management.  Tr. 488.

On March and June, 2010, Dr. Pellegrino continued Davis's Darvocet because Davis was reporting that it helped her function and tests did not show any adverse side effects.  Tr. 493, 516.  On September 3, 2010, Davis returned to Dr. Pellegrino and reported that she had been in a motor vehicle accident and hurt her neck and right wrist.  Tr. 515.  She had received treatment at the Affinity Emergency Room following the motor vehicle accident. Tr. 515.  Dr. Pellegrino advised Davis to obtain an x-ray of her right wrist to determine if it was fractured.  Tr. 515.  Davis reported persistent pain, averaging a 7 out of 10.  Tr. 515.  Because of increased pain, Vicodin had been prescribed.  Tr. 515.  Davis reported that the Vicodin helped more than the Darvocet and Dr. Pellegrino agreed to continue to prescribe Vicodin in place of Darvocet.  Tr. 515.

On October 13, 2010, Davis returned to Dr. Pellegrino.  Tr. 513-14. Contrary to Dr. Pellegrino's advice, Davis had not had an x-ray of her right wrist taken.  Tr. 513.  Davis reported that she was taking Vicodin twice each day, rather than three times each day, as prescribed, and she was continuing to take Darvocet four times each day because she felt that the Darvocet was

lasting longer than the Vicodin.  Tr. 513.  She inquired about resuming Percocet.  Tr. 513.  She reported having visited the emergency room within the last month for increased pain.  Tr. 513.  Dr. Pellegrino advised Davis that he was concerned about her lack of compliance with his recommendations and her continued attempts to self adjust her pain medication.  Tr. 513-14.  He advised that he could not recommend that she continue with opioid medications.  Tr. 513-14.  Instead, he prescribed a Medrol Dosepak for her persistent pain and ordered a cervical MRI[2] and electrodiagnostic testing of her right arm and neck.[3]  Tr. 514.

On November 24, 2010, Davis saw Dr. Pellegrino and reported that the Medrol Dosepak did not help.  Tr. 508.  She indicated that the Vicodin did help and she had been taking it three times each day but had finished the last of her prescription.  Tr. 508.  Dr. Pellegrino discussed fibromyalgia strategies with Davis and advised her he would not refill her Vicodin without first obtaining a definitive quantitative analysis of Davis's urine.  Tr. 508.  He noted that her cervical MRI did not show any significant abnormalities.[4]  Tr. 508.   No further appointments with Dr. Pellegrino are noted.

### b.  Gastrointestinal related issues

On September 4, 2008, Davis saw Nabil Fahmy, M.D., for a gastroenterology consult for complaints of abdominal pain and bloating.  Tr. 359-60.  At the time of the consult, Davis had lost approximately 40 pounds since May.  Tr. 359.  She reported having had diarrhea for about two months but reported some improvement.  Tr. 359.  Prior to her bouts of diarrhea, Davis reported being severely constipated.  Tr. 359.  Dr. Fahmy diagnosed Davis with epigastric pain, heartburn, reflux and recommended a CT of the abdomen, esophagogastroduedenoscopy (EGD)

---

[2] The MRI was performed on November 4, 2010.  Tr. 509.

[3] The electrodiagnostic testing was performed on October 26, 2010.  Tr. 510.

[4] The October 26, 2010, electrodiagnostic testing showed no significant abnormalities.  Tr. 510.

and colonoscopy.  Tr. 360-61.  The results of the October 8, 2008, EGD revealed Grade 1 esophagitis, moderate gastritis, and duodentitis.  Tr. 343.  Dr. Fahmy obtained biopsies and recommended that Davis stop taking Pepcid and begin taking Prevacid.  Tr. 343.

On January 27, 2009, Davis went to the Affinity Medical Center emergency room with complaints of abdominal pain.  Tr. 394-400.  Davis indicated that she had chronic diarrhea. Tr. 397.  An ultrasound of Davis's abdomen was normal.  Tr. 384.  On discharge, Davis was advised to see her gastroenterologist "ASAP."  Tr. 399.

During 2009 and 2010, treatment records show that Davis contacted Dr. Fahmy's office via telephone and Dr. Fahmy refilled prescriptions periodically.[5]  Tr. 530-31.  However, Davis did not see Dr. Fahmy again until January 6, 2011.  Tr. 531.  She presented to Dr. Fahmy with complaints of severe epigastric pain, nausea, vomiting, bile emesis, severe heartburn and reflux. Tr. 531.  She had lost 10 pounds since last seeing Dr. Fahmy and reported having no appetite and experiencing diarrhea more than 6 times each day.  Tr. 531.   Dr. Fahmy diagnosed Davis with epigastric pain, gastroesophageal reflux disease, IBS with diarrhea and anemia.  Tr. 532.  He ordered an EGD, ultrasound of Davis's liver and gallbladder and an HIDA scan.  Tr. 532.   The January 19, 2011, ultrasound of Davis's gallbladder, liver and pancreas was unremarkable.  Tr. 529.  Also, the January 19, 2011, hepatic biliary scan of Davis's gallbladder was normal with mild enteric gastric reflux following Kinevac stimulation.  Tr. 527.  A January 21, 2011, upper endoscopy revealed Grade 1-2 esophagitis, mild to moderate gastritis, a normal duodendum, and

---

[5] In October 2010, Dr. Fahmy agreed to refill Davis's prescription once more but indicated a desire to see her because he had not seen her for 2 years.  Tr. 530-31.

a bezoar[6] occupying 30% of the gastric volume, with no evidence of outlet obstruction.  Tr. 526.

Dr. Fahmy recommended a low-residue diet and prescribed medications.  Tr. 526.

### c.   Mental health related issues

On May 26, 2009, Davis, upon Dr. Lewis's recommendation, sought an evaluation at

Phoenix Rising for depression and nervousness related to chronic pain.  Tr. 436-47.  Davis

reported having some problems with housework and indicated she was unable to work because

of her pain issues.  Tr. 437.  She reported having problems falling and staying asleep.  Tr. 442.

Following the evaluation, she was given a diagnosis of major depressive disorder, recurrent, mild

with a GAF score of 65.[7]  Tr. 444.   Also, there was a note that Davis would benefit from coping

skills to improve her mood and functioning.  Tr. 442.

Thereafter, on June 17, 2009, Davis was seen again at Phoenix Rising for an initial

psychiatric examination.  Tr. 448-51.  She was given a diagnosis of anxiety/depressive disorder

due to severe pain.  Tr. 450.  She was assessed a GAF score of 60.[8]  Tr. 450.

On November 21, 2009, Davis was seen at Phoenix Rising and she reported doing o.k.

Tr. 503-04.  She reported stability with her medication and that she was able to sleep but she was

still having anxiety throughout the day.  Tr. 503.

On February 3, 2010, and on April 14, 2010, Davis was seen at Phoenix Rising and

reported feeling better and functioning well.  Tr. 499-501.

---

[6] A bezoar is "a concretion of foreign material found in the gastrointestinal tract or urinary tract."  *See* Dorland's
Illustrated Medical Dictionary, 31st Edition, 2007, at 215.

[7] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or
some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the
household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

[8] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or
school functioning.  *Id.*

### d.  Medical Tests

On July 19, 2006, an esophagogatroduodenoscopy and esophageal dilation was performed which showed a completely normal esophagus, stomach, and duodendum and no evidence of obstruction or neoplasm.  Tr. 358.

On July 28, 2006, an ultrasound of Davis's abdomen was performed (Tr. 355) and a CT scan of her abdomen and pelvis was performed (Tr. 356).  The ultrasound revealed "[u]pper normal common duct size" and "[o]bscured pancreatic head."  Tr. 355.  The CT scan revealed no acute abnormalities, with small lymph nodes in the right lower quadrant most likely reactive in nature.  Tr. 356.

On June 27, 2007, upon the referral of Karin T. Riggs, M.D., Davis underwent an ultrasound of her abdomen.  Tr. 233.  The ultrasound showed a normal liver, gallbladder, pancreas and spleen.  Tr. 233.  On July 30, 2007, Davis underwent a CT scan of her pelvis and abdomen.  Tr. 233, 257.  The CT scan showed no acute abnormalities.  Tr. 233, 257.  On October 2, 2007, Davis underwent a CT scan of her cervical spine (Tr. 254) and CT scan of her head (Tr. 256).  The CT scan of her cervical spine was negative for disk herniation or canal stenosis.  Tr. 254.  The CT scan of her head was unremarkable and negative for mass lesion or enhancing abnormality.  Tr. 256.  On October 17, 2007, Davis underwent an MRI of her cervical spine (Tr. 250) and brain (Tr. 252).  The MRIs were normal and showed no evidence of disk herniation or evidence of multiple sclerosis plaques in the cervical spinal cord.  Tr. 250, 252.

On September 10, 2008, a CT scan of Davis's abdomen and pelvis was performed.  Tr. 352-53.  The CT scan revealed no acute intraabdominal or pelvis process; status post hysterectomy; stable right cortical cyst; and no significant changes compared to the July 30, 2007, scan.  Tr. 352-53.  On October 8, 2008, an esophagogastroduedenoscopy (EGD) was

performed.  Tr. 343.  The EGD revealed Grade 1 esophagitis, moderate gastritis, and duodentitis. Tr. 343.

On January 27, 2009, following Davis's presentation at the Affinity Medical Center emergency room with complaints of abdominal pain, an ultrasound of Davis's abdomen was performed.  Tr. 384, 394-400.  The ultrasound was normal.  Tr. 384.  On June 15, 2009, Davis had an x-ray taken of her cervical spine that showed a normal-appearing cervical spine.  Tr. 433.

On October 26, 2010, Davis underwent electrodiagnostic testing of her right arm and neck.  Tr. 510-12.  The testing showed normal nerve stimulation in the right arm without nerve slowing or amplitude loss; her right neck and arm were without membrane irritability or motor unit changes; there were no significant electrodiagnostic abnormalities noted such as radiculopathy, nerve entrapment, or neuropathy; and no significant nerve irritation.  Tr. 510.  On November 4, 2010, a cervical spine MRI was performed and was negative.  Tr. 509.

On January 19, 2011, an ultrasound of Davis's gallbladder, liver and pancreas was performed and revealed unremarkable results.  Tr. 529.  On January 19, 2011, a hepatic biliary scan was performed of Davis's gallbladder showing a normal gallbladder biliary scan with mild enteric gastric reflux following Kinevac stimulation.  Tr. 527.  On January 21, 2011, an upper endoscopy revealed Grade 1-2 esophagitis, mild to moderate gastritis, a normal duodendum, and a bezoar occupying 30% of the gastric volume, with no evidence of outlet obstruction.  Tr. 526.

### 2.      Consultative physicians

#### a.      Paul T. Scheatzle, D.O. – physical

On May 11, 2009, Paul R. Scheatzle, D.O., performed a consultative physical examination of Plaintiff.  Tr. 408-11, 412-13.  Plaintiff's complaints included pain throughout her whole body, fibromyalgia, and cervical myofascial pain syndrome.  Tr. 412.  On physical

examination, palpation revealed tenderness diffusely with fibromyalgia tender points of the

extensor forearms, pretibial region, supraspinatus, trapezius, lower lumbar, and suboccipital

regions.  Tr. 413.  Dr. Scheatzle indicated that Plaintiff had myofascial trigger points as well in

the upper and lower trapezius, primarily on the right side.  Tr. 413.  Plaintiff had no loss of

balance and her gait was not antalgic.  Tr. 413.  Dr. Scheatzle noted that Plaintiff could transfer

on and off the examination able without difficulty.  Tr. 413.  Plaintiff's range of motion in her

right shoulder was decreased but was intact elsewhere.  Tr. 413.  Her hand function was normal.

Tr. 413.  Dr. Scheatzle opined that, despite her impairments, Plaintiff's sitting is unlimited; with

a change of position every 30 minutes with stop for rest, her standing or walking is unlimited;

she can lift at the medium level up to 50 pounds occasionally or 20 pounds more frequently; she

can carry 40 pounds; she can handle objects within normal limits; and her hearing speaking,

traveling, understanding, memory, concentration, persistence, social interaction, and adaption are

within normal limits.  Tr. 413.

### b.      Michael J. Harvan, Ph.D. – mental

On August 11, 2009, Michael J. Harvan, Ph.D., conducted a consultative examination of

Plaintiff.  Tr. 454-59.  Dr. Harvan diagnosed Plaintiff with adjustment disorder and depressed

mood and an overall GAF score of 70.[9]  Tr. 458.  Dr. Harvan opined that her ability to

understand and follow instructions is mildly impaired, her ability to maintain attention to

perform simple or multi-step, repetitive tasks is moderately impaired; her ability to relate to

---

[9] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

others, including fellow workers and supervisors, is not impaired; and her ability to withstand the stress and pressures associated with day-to-day work activity is not impaired.[10]  Tr. 458-59.

### 3.    State agency reviewing physician

#### a.    Gary Hinzman, M.D. – physical

On September 14, 2009, Gary Hinzman, M.D., completed a Physical Residual Functional Capacity ("RFC") Assessment.  Tr. 478-86.  He opined that, although the medical evidence confirms Plaintiff's allegation of a severe, medically determinable impairment, Plaintiff's allegations of the limitations resulting from that impairment were not fully credible in part.  Tr. 484.  He stated that Plaintiff has a history of treatment for myalgias. Tr. 484.  However, he indicated that her strength is 5/5, she has a normal gait, and a normal range of motion.  Tr. 484. He opined that Plaintiff has the RFC to occasionally lift and/or carry and push and/or pull 50 pounds; frequently lift and/or carry and push and/or pull 25 pounds; stand and/or walk for about 6 hours in an 8-hour workday; she must periodically alternate sitting and standing; and no postural, communicative, environmental, manipulative, or visual limitations.  Tr. 480-83.

#### b.    Leslie Rudy, Ph.D. – mental

On August 28, 2009, Leslie Rudy, Ph.D., completed a Mental Residual Functional Capacity Assessment (Tr. 461-63) and a Psychiatric Review Technique (Tr. 465-78).  In the Mental RFC Assessment, Dr. Rudy opined that Plaintiff is moderately limited in 7 of the 20 rated categories and not significantly limited in the other 13 categories.  Tr. 461-62.  Based on her Mental RFC Assessment, Dr. Rudy concluded that Plaintiff:

> Retains the capacity for simple and familiar multistep tasks in a setting without demands for fast pace, high production or frequent changes in assigned tasks

---

[10] He noted that Plaintiff does exhibit very mild symptoms of depressed mood which are related to the pain she experiences.  Tr. 459.

[and] . . . can interact appropriately but would not tolerate demands for sustained interactions with the general public.  She can adapt to routine changes.
Tr. 463.

In the Psychiatric Review Technique, Dr. Rudy opined that Plaintiff is mildly limited in her activities of daily living and in maintaining social functioning; moderately limited in maintaining concentration, persistence or pace; and had no episodes of decompensation.  Tr. 475.

**C.    Testimonial Evidence**

**1.    Davis's Testimony**

Davis was represented by counsel at the administrative hearing.  Tr. 49-68.  She testified regarding the impact that her pain, fatigue, anxiety and gastrointestinal problems have on her day-to-day activities.  Tr. 49-68.  A couple of days each week, she cannot get out of bed because of her fatigue.  Tr. 66.  She does breathing treatments twice each day for her breathing problems.  Tr. 67.  She can only sit, stand or walk for about 10-15 minutes at a time.  Tr. 58-59.  She has difficulties performing household chores.  Tr. 61-62.  At times, she needs assistance with her self-care.  Tr. 61, 65-66.  She drops things.  Tr. 59.  She has to use the bathroom six to seven times each day for about 10-15 minutes at a time.  Tr. 62-63.  She sometimes has accidents during the day and wears protective garments as a result.  Tr. 63.  She takes medication for her gastrointestinal problems which seems to help with the abdominal discomfort and pain but not the diarrhea.  Tr. 63-64.  She experiences panic episodes because she feels like she cannot go anywhere as a result of her pain and being in and out of the bathroom.  Tr. 65.  She also has panic attacks when she is in a crowd of people.  Tr. 65.  Her panic attacks last a couple of hours; with medication, her panic attack will usually go away.  Tr. 65.  However, because her Xanax makes her very tired, she does not like to take the mediation during the day.  Tr. 65.  Because of

her frustration with her medical conditions, she has crying spells off and on every couple days that last about 15-20 minutes.  Tr. 66-67.

### 2. Vocational Expert's Testimony

Vocational Expert Ms. Alina Kertanich ("VE") testified at the hearing.  Tr. 68-75.  The VE stated that Plaintiff's past work as a nurse's aide was a semi-skilled position performed at the medium exertion level.  Tr. 71.  The ALJ presented the VE with the following hypothetical: a younger individual with limited education and with Plaintiff's work history who can perform medium work; must rest after standing and walking for more than 30 minutes; limited to simple, routine tasks and can perform work not requiring fast paced, high production demands; should not have sustained interactions with the public; and must avoid concentrated exposure to dust, fumes, odor, gases and poor ventilation.  Tr. 71-72.  Following the VE's request for clarification, the ALJ clarified that the individual would need to rest about 5 or 10 minute after standing or walking or would need a sit/stand option.  Tr. 72.  The VE testified that there would be no medium exertion level jobs available.  Tr. 72.  However, at the light exertion level, the following unskilled jobs would be available: garment sorter (over 280,000 positions available in the national economy); marker (over 160,000 positions available in the national economy); and mail clerk (over 170,000 positions available in the national economy).  Tr. 72-73.

In response to the ALJ's second hypothetical, which changed the exertion level from light to sedentary, the VE testified that the following unskilled jobs would be available: ticket checker (over 150,000 positions available in the national economy); document preparer (over 200,000 positions available in the national economy); and small parts assembler (over 225,000 positions available in the national economy).  Tr. 73.

In response to the ALJ's third hypothetical, the VE testified that, if the hypothetical individual described in the second hypothetical also needs one to two short unscheduled work breaks, i.e., 15 minutes, in addition to regularly scheduled work breaks, there would be no jobs available in the national economy.  Tr. 73-74.

In response to a fourth hypothetical, posed by Plaintiff's counsel, the VE testified that, if the hypothetical individual described in the second hypothetical could only occasionally perform fine finger manipulation or gross handling with the upper extremities, the document preparer, assembler and ticket checker positions would not be available.  Tr. 74.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his February 15, 2011, decision, the ALJ made the following findings:

1.      Plaintiff meets the insured status requirements through March 31, 2013. Tr. 13.

2.      Plaintiff has not engaged in substantial gainful activity since September 15, 2008, the alleged onset date. Tr. 13.

3.      Plaintiff has the following severe impairments: fibromyalgia, cervical segmental dysfunction, adjustment disorder with depressed mood,

---

[11] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

chronic fatigue syndrome, and major depressive disorder.  Tr. 13-15. Plaintiff's refractory plantar fasciitis; gastrointestinal problems, including irritable bowel syndrome ("IBS") and gastroesophageal reflux disease ("GERD"); breathing problems; insomnia; Burkitt's lymphoma; and lumbar myofascial pain syndrome, chronic diffuse myalgias, or thoracic and trapezius myofascial points are non-severe impairments.  Tr. 14-15.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.[12]  Tr. 15-16.

5.   Plaintiff has the residual functional capacity ("RFC") to perform light work except she must rest after standing and walking for more than 30 minutes.  She must avoid concentrated exposure to dust, fumes, odors, gases, and poor ventilation.  She is limited to simple, routine tasks in a work setting that does not require meeting fast-paced, high production demands.  She cannot have interaction with the public.  Tr. 16-20.

6.   Plaintiff is unable to perform any past relevant work.  Tr. 20.

7.   Plaintiff was born on April 29, 1976, and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 20.

8.   Plaintiff has a limited education and is able to communicate in English. Tr. 20.

9.   Transferability of jobs skills is not material to the determination of disability.  Tr. 20.

10.   Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in the national economy that Plaintiff can perform, including garment sorter, marker, and mail clerk. Tr. 21-22.

Based on the foregoing, the ALJ determined that Davis had not been under a disability

from September 15, 2008, through the date of the decision.  Tr. 22.

---

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

## V. Parties' Arguments

**A.    Plaintiff's Arguments**

Plaintiff argues the ALJ's determination that she has the RFC to perform a range of light, unskilled work, is not supported by substantial evidence.  Doc. 12, pp. 15-20; Doc. 15.  More specifically, she asserts the ALJ erred by not finding her gastrointestinal impairment to be a severe impairment (Doc. 12, pp. 17-18) and the ALJ did not properly evaluate her credibility as it pertained to her fibromyalgia (Doc. 12, pp. 18-20).  Accordingly, Plaintiff seeks reversal and an award of benefits or, alternatively, a remand.  Doc. 12, p. 20; Doc. 15.

**B.    Defendant's Arguments**

In response, the Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's gastrointestinal impairment was not severe.  Doc. 14, pp. 14-17.  Further, the Commissioner argues the ALJ's credibility finding is also supported by substantial evidence. Doc. 14, pp. 17-19.   Accordingly, the Commissioner asserts that her decision should be affirmed.  Doc. 14, p. 20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20 03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.    **The ALJ did not err in his Step Two determination when he concluded that Plaintiff's gastrointestinal problems, including irritable bowel syndrome ("IBS") and gastroesophageal reflux disease ("GERD"), were non-severe impairments.**

Davis argues that the ALJ erred when he concluded, at Step Two, that her gastrointestinal impairments were not severe.  Doc. 12, pp. 17-18, Doc. 15, pp. 1-3.  Contrary to this argument, substantial evidence supports the ALJ's determination at Step Two that Davis's gastrointestinal problems, including irritable bowel syndrome ("IBS") and gastroesophageal reflux disease ("GERD"), were non-severe impairments.

At Step Two, a claimant must show that she suffers from a severe medically determinable physical or mental impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  It is Davis's burden to show the severity of her impairments.  *Foster v. Secretary of Health & Human Svcs.,* 1990 U.S. App. LEXIS 5725, *5 (6th Cir. 1990).  An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience).  *Long v. Apfel*, 1 Fed. App'x. 326, 331-332 (6th Cir. 2001); 20 C.F.R § 404.1521(c).  Basic work activities are defined by the regulations as "'the abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) 'understanding, carrying out, and remembering simple instructions;' (4) 'use of judgment;' (5) 'responding appropriately to supervision, co-workers, and usual work situations;' and (6) 'dealing with change in a routine work setting.'"  *Simpson v. Comm'r Soc. Sec.*, 344 Fed. App'x. 181, 190 (6th Cir. 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

In *Higgs v. Bowen*, the Sixth Circuit found that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  However, as noted by the *Higgs* court, "[t]he mere diagnosis of [an ailment], of course, says nothing about the severity of the condition." *Id.* at 863.  Since *Higgs*, courts have found substantial evidence to support a finding of no severe impairment if the medical evidence contains no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, *See, e.g.*, *Long*, 1 Fed. App'x. at 332 (reviewing Step Two cases since *Higgs*).

Notwithstanding Davis's own statements that her symptoms caused her to need to use the restroom as often as six to seven times in day (Doc. 15, p. 2), the record in this case does not contain statements by a treating physician indicating that Davis's gastrointestinal problems result in any specific work-impairing limitations.  Further, although Davis complains of allegedly severe and disabling symptoms, she did not require regular gastroenterologist visits.  For example, as noted by the ALJ, Davis did not seek treatment for her gastrointestinal problems for a period of two years.  Tr. 14.  She saw Dr. Fahmy in 2008 and, notwithstanding an emergency room visit in 2009 which included a recommendation to follow-up with her gastroenterologist "ASAP," Davis did not see Dr. Fahmy again until 2011.  Tr. 359-61, 399, 531-32.

In an attempt to discredit the ALJ's reliance on Davis's two year gap in gastroenterology treatment as a reason for finding her gastrointestinal impairment to not be severe, Davis argues that the records support her claim that her symptoms, such as needing to use the restroom six or seven times each day, persisted during that two year gap in treatment.  Doc. 15, p. 2.  She points to an emergency room visit in January 2009, wherein she complained of diarrhea.[13]  Tr. 397.

---

[13] While she complained of diarrhea during her January 27, 2009, ER visit (Tr. 397), earlier that month, during a visit with Dr. Lewis, Davis denied loss of bowel or bladder control.  Tr. 540.

However, an ultrasound was taken of Davis's abdomen at that time and, as noted by the ALJ, the results of that test were normal.  Tr. 14, 384.   The ALJ also noted that, a 2011 ultrasound of the gallbladder, was normal.[14]  Tr. 14, 529.  Davis also points to treatment notes from a May 5, 2009, consultation with Dr. File wherein Davis reported intermittent diarrhea and constipation. Doc. 15, p. 2 (citing Tr. 422).  However, as the treatment note indicates, the diarrhea was *intermittent*, and further, the same treatment note indicates that Davis had been prescribed Zegerid for her gastrointestinal issues and it was helping.  Tr. 422.  Further, as noted by the ALJ, Davis did not complain of abdominal issues during her consultative examination with Dr. Scheatzle on May 11, 2009 (Tr. 14, 412-13) and she rarely mentioned the problem to her primary care physician, Dr. Rigg (Tr. 14, Tr. 488-90).

Davis also argues that her need for medication refills during the two year gap in visits to Dr. Fahmy demonstrates the severity of her impairment.  Doc. 15, p. 2.  Davis fails, however, to demonstrate that the medication she was taking was ineffective in managing her gastrointestinal symptoms.  As noted above, on May 5, 2009, she reported to Dr. File that medication was helping and also indicated that she was not experiencing nausea, vomiting or abdominal pain at that time.  Tr. 422.  Further, Davis fails to demonstrate that simply using medication on a regular basis is sufficient evidence to show that an impairment is severe or that the ALJ's decision is not supported by substantial evidence.

As additional evidence of the non-severe nature of Davis's gastrointestinal issues, the ALJ noted that objective medical tests were normal.  Tr. 14.  While the 2008 EGD revealed Grade 1 esophagitis, moderate gastritis and dueodenitis (Tr. 343), and the 2011 EGD revealed Grade 1-2  1 esophagitis, mild to moderate gastritis, and a bezoar occupying 30% of gastric volume (Tr. 526), Dr. Fahmy's treatment recommendations were limited to: prescription

---

[14] That same January 19, 2011, ultrasound showed normal findings relative to the pancreas and liver.  Tr. 529.

medication, a low residue diet, and follow-ups (Tr. 343, 526).  Davis argues that her alleged worsening of symptoms in 2011 is explained, at least, in part, by the presence of the bezoar. Doc. 12, p. 17.  Thus, she argues that the ALJ's failure to discuss or note the 2011 EGD finding regarding the bezoar is a basis for reversal and remand.  However, Davis's argument is unsupported by medical evidence.  Further, Davis ignores the additional finding by Dr. Fahmy regarding the bezoar that there was no evidence of outlet obstruction.  Tr. 526.

The record confirms that the ALJ's decision, under Step Two that, based on the minimal treatment and significant gap in treatment, Davis's gastrointestinal impairments were non-severe is supported by substantial evidence.  Accordingly, reversal and remand are not recommended based on Davis's Step Two argument.

**B.  The ALJ did not err in assessing Plaintiff's credibility as it relates to her fibromyalgia.**

Notwithstanding the fact that neither of her two pain management physicians nor any other physician opined that her fibromyalgia prevented her from performing any work activity, Davis challenges the ALJ's credibility assessment.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244, n.3 (6th Cir. 2007) (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)).  The Sixth Circuit has recognized that fibromyalgia can result in a disability. *See, e.g., Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988). Nevertheless, fibromyalgia presents challenges in disability analyses because, "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs."  *Rogers*, 486 F.3d at 243; *see also Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003) ("Fibromyalgia is an 'elusive' and 'mysterious'

disease. It has no known cause and no known cure.").  In other words, objective medical evidence corroborating allegations of pain derived from fibromyalgia is often nonexistent.  *See Id.*  In this regard, the Sixth Circuit has recognized that, for claims based upon fibromyalgia, the cause of the disability is not the underlying condition itself but, rather, the symptoms associated with the condition -- including complaints of pain, stiffness, fatigue, and inability to concentrate.  *Rogers*, 486 F.3d at 247.  Despite the unique nature of the impairment, however, a "diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008), *citing and quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("'Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [the claimant] is one of the minority.'")).

Because neither the presence nor the severity of fibromyalgia can be confirmed by objective testing, there is a greater emphasis on the claimant's credibility.  *Swain*, 297 F.Supp.2d at 990.  Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain.  *Swain*, 297 F.Supp.2d at 990 (citing 20 C.F.R. § 416.929(a)).  First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. § 416.929(a).  Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*  In addition to the objective medical evidence, relevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects

of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions. *Id.*; s*ee also* Social Security Ruling ("SSR") 96–7p, 1996 WL 374186, at *2–3.

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including the claimant. *Rogers*, 486 F.3d at 247. An ALJ's findings concerning the credibility of a claimant's testimony about his or her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The court may not "try the case de novo, nor resolve conflicts in evidence." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

In this case, the ALJ accepted that Davis suffered from fibromyalgia and found it to be a severe impairment. Tr. 13, 17. However, the ALJ did not find Davis's allegation that her fibromyalgia prevented her from performing *any* work to be entirely credible. Tr. 16-20. He determined that Davis could perform a limited range of light work with restrictions relative to standing and walking and was therefore not disabled. Tr. 16-22. In reaching his decision, the ALJ considered, among other things, evidence of exaggeration of symptoms, non-compliance with treatment recommendations, consultative examination findings, and mental health

treatment.  Tr. 20.    The ALJ's analysis of the evidence is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment and whether that determination is supported by substantial evidence.  SSR 96–7p, 1996 WL 374186, at 4.

The ALJ considered the effectiveness of Davis's various pain medications as well as her non-compliance with recommended treatment.  Tr. 17-19.  SSR 96–7p, 1996 WL 374186, at 7 (an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.").  Davis was treated by two different pain management physicians, Dr. Pellegrino and Dr. Lewis.  She first treated with Dr. Pellegrino, switched to Dr. Lewis, and then resumed treatment with Dr. Pellegrino.[15]  Tr. 490, 494-95.   As discussed by the ALJ, both Dr. Pellegrino and Dr. Lewis noted that Davis was non-compliant with treatment recommendations, including Dr. Pellegrino's recommendations that she discontinue use of Percocet and Ultracet following her Tylenol overdose (Tr. 17, 263, 363) and obtain an x-ray of her right wrist because of complaints of right wrist pain (Tr. 19, 513-14), and Dr. Lewis's recommendation regarding certain medications (Tr. 18, 534) and that Davis begin an exercise regimen (Tr. 18, 534-35).  Dr. Lewis advised that Davis needed to give a new medication an adequate trial period, i.e., 4-6 weeks, in order to determine its effectiveness.  Tr. 18, 534.  However, after Dr. Lewis prescribed medication, Davis, without first discussing it with Dr. Lewis, would stop taking the medication after a day or two because Davis felt that there were side effects.  Tr. 18, 534.  During an April

---

[15] Psychologist Dr. Harvan noted that, during his August 11, 2009, consultative examination of Davis, she indicated that she was unhappy with Dr. Lewis who was not prescribing any effective pain medications; Dr. Lewis did not want to prescribe pain medications for someone her age.  Tr. 455.  In contrast, Dr. Riggs noted that Davis had switched from Dr. Pellegrino to Dr. Lewis because Dr. Lewis was more conveniently located than Dr. Pellegrino. Tr. 490.

23, 2009, visit, Dr. Lewis indicated that, if she continued to disregard treatment recommendations, Dr. Lewis would not agree to treat her any longer.  Tr. 18, 536.

The ALJ also considered Dr. Lewis's reports of possible exaggeration or malingering by Davis.  Tr. 18, 540-41.  He considered the fact that, on March 5, 2010, Davis reported that Darvocet alleviated some of her pain and allowed her to function during the day.  Tr. 18, 493.  Also, during the March 5, 2010, visit, Dr. Pellegrino observed that Davis's gait and balance were normal.  Tr. 18, 493.  The ALJ noted that medical reports from Dr. Lewis and Dr. File showed that Davis exhibited good strength and Dr. File's report showed no point tenderness to palpation of the spine.[16]  Tr. 18, 521, 533.  Further, as noted by the ALJ, Dr. File concluded that there was no evidence of a rheumatologic disease but noted that a low potassium level and low Vitamin D level might be contributing to Davis's fatigue.  Tr. 18, 431.

Additionally, the ALJ considered consultative examinations and state agency reviewing physicians' opinions as to limitations resulting from Davis's impairments, none of which concluded that Davis was unable to perform any work.  Tr. 19-20.   Although the consultative and state agency reviewing physicians opined that Davis could perform medium level work, the ALJ reasonably accounted for Davis's impairments by limiting her even further to light work with restrictions for standing and walking and a limitation for simple, routine tasks in a work setting not involving fast-paced, high production demands.  Tr. 16-20.

Davis's main complaint appears to be that the ALJ did not precisely address each specific factor outlined in Social Security Ruling 96-7p.  This argument places form over substance.  Even though the ALJ did not individually address each factor, his written decision demonstrates

---

[16] Further, the ALJ considered Davis's complaints against the backdrop of normal objective medical tests.  Tr. 19.  For example, because of Davis's complaints of pain, in November 2010, Dr. Pellegrino ordered a cervical MRI which was negative.  Tr. 19, 509.  Also, Dr. Pellegrino indicated that electrodiagnostic testing that was performed in October 2010 showed no significant abnormalities.  Tr. 19, 510.

that he reasonably assessed Davis's credibility based on a full consideration of the relevant evidence and the decision is sufficiently clear to allow a reviewing court to determine the weight the ALJ gave to Davis's complaints of debilitating pain  Tr. 16-20; *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732-33 (N.D. Ohio 2005).

In sum, the ALJ provided a number of reasons for discounting Davis's credibility and substantial evidence supports the ALJ's finding that Davis's fibromyalgia is not so severe as to be totally disabling.  The Commissioner's decision should therefore be affirmed.

### VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated:  July 16, 2013

Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).